NOT YET SCHEDULED FOR ORAL ARGUMENT

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 13-5203

HANI RASCHID ABDULLAH,

*Petitioner-Appellant*

v.

BARACK OBAMA, *et al.*,

*Respondents-Appellees.*

On Appeal from the United States District Court for the
District of Columbia, No. 05-cv-0023, Hon. Richard Roberts, *Judge*

## **OPENING BRIEF FOR PETITIONER-APPELLANT**

Stephen M. Truitt
600 Fourteenth Street NW
Hamilton Square, Suite 500
Washington, DC 20005
(202) 220-1452
truittsm@gmail.com

Charles H. Carpenter
CARPENTER LAW FIRM plc
210 North Higgins Avenue, Ste. 336
Missoula, Montana  59802
(406)543-0511
carpentc@carpenterlawfirmplc.com

*Attorneys for Petitioner-Appellant*          Dated: August 30, 2013

## CERTIFICATE OF PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

A.    **Parties and *Amici*.**  The following parties appeared before the district court in *Abdullah v. Bush,* Civ. No. 05-23:

- Hani Saleh Rahid Abdullah, Petitioner/Plaintiff

- Yosra Saleh Rashid Abdullah, Petitioner/Plaintiff

- Rami Bin Saad Al-Oteibi, Petitioner/Plaintiff

- President Barack Obama, Respondent/Defendant

- Secretary of Defense Chuck Hagel, Respondent/Defendant

- Rear Admiral John Smith Jr., Respondent/Defendant

- Army Col. John V. Bogdan, Respondent/Defendant

There are no *amici.*

B.    **Rulings Under Review.**  The ruling under review is the order of May 21, 2013 denying Petitioner's motion for preliminary injunction.

C.    **Related Cases.**  Petitioner is not aware of any related cases.

## TABLE OF CONTENTS

Page

CERTIFICATE OF PARTIES, RULINGS UNDER REVIEW,
AND RELATED CASES...................................................................... i

TABLE OF AUTHORITIES.................................................................iv

GLOSSARY OF ABBREVIATIONS ...................................................vi

JURISDICTIONAL STATEMENT..................................................... 1

STATEMENT OF ISSUES................................................................. 1

STATUTES AND REGULATIONS ................................................... 2

STATEMENT OF THE CASE ........................................................... 2

STATEMENT OF THE FACTS .......................................................... 4

SUMMARY OF THE ARGUMENT................................................... 5

ARGUMENT ...................................................................................... 6

I.      Standard of Review ................................................................ 6

II.     Under International Law, Indefinite or Permanent Detention is Prohibited.... 6

        **A.** The Content of International Law............................................ 6

        **B.** The Third Geneva Convention Prohibits Indefinite Detention ................. 9

        **C.** Declarations of International Authorities Confirm the Illegality of
        Such Detention Both Under International Humanitarian Law and
        the Law of War. ...................................................................... 10

III.    The Executive Recognition Agreement of Yemen Prevents Congressional
        Nullification of International Law Rights of Yemeni Citizens...................... 12

        **A.** This Court's Decision in *Zivotofsky* Insulates the Exercise of the
        President's Exclusive Recognition Power from Congressional
        Nullification ......................................................................... 13

IV.     Indefinite or Permanent Detention is Likewise Prohibited by
        Domestic Law.................................................................. 14

V.      The District Court's Failure to Enjoin Other Violations of International
        Law was Erroneous ........................................................ 16

VI.     Refusal to Issue The Injunction Against Such Detention Was Error............. 16

CONCLUSION .................................................................... 19

CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

ADDENDUM

APPENDIX

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Al Warifi v. Obama*, 716 F.3d 627 (D.C. Cir. 2013) ............................................. 14

*Al-Fayed v. Central Intelligence Agency*, 254 F. 3d 300 (D.C. Cir 2001) ............... 6

Ahmadou Sadiao Diallo (*Republic of Guinea v, Democratic Republic of the Congo*), Merits Judgment, I.C.J. Reports 2010 .............................................. 7, 12

*Hamdan v. Rumsfeld*, 548 U.S. 557 (2006) ................................................... 8, 15, 16

*Hamdan v. United States of America*, 696 F.3d 1238 .................................... 4, 8, 19

*McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485 (D.C. Cir. 2008) ....... 12

*Ex Parte Quirin*, 317 U.S. 1 (1942) ................................................................... 8

*United States v. Klein*, 80 U.S. 121 (1871) ......................................................... 14

*Zivotofsky v. Sec'y of State*, 2013 U.S. App. LEXIS 14894 (D.C. Cir. July 23, 2013) .......................................................................... 6, 13, 18

STATUTES

28 U.S.C. § 1292 ................................................................................................... 1

28 U.S.C. § 2241 .............................................................................................. 1, 12

50 U.S.C.§ 1541 ................................................................................................... 2

Authorization for the Use of Military Force, § 2(a), 115 Stat. 224§ 2(a) ................. 2

Foreign Relations Authorization Act, Fiscal Year 2003, Public Law 107-228 (Sept. 30, 2002) ............................................................................................. 14

Military Commissions Act of 2006 ...................................................................... 14

\* Authorities on which we chiefly rely.

## OTHER AUTHORITIES

Army Regulation 190-8 ............................................................... 14, 15

Fed R. App. P. 4(a) ...................................................................... 1

Fed. R. App. P. 32 ....................................................................... 1

Final Report - Guantanamo Review Task Force (Jan. 22, 2010)
www.justice.gov/ag/guantanamo-review-final-report.pdf. .................... 2

Levie, *Prisoners of War in International Conflicts*, 59 Int'l Law Stud. at
127-29 (Naval War College 1979) ................................................. 18

Restatement (Third) of the Foreign Relations Law of the United States ........ 7, 8, 12

Uniform Code of Military Justice ....................................................... 10

United Nations Human Rights, Office of the High Commissioner for Human
Rights, *Respect for human rights key to stabilization succeeding in DRC,
says top UN human rights official* (Aug. 28, 2013),
www.ohchr.org/EN/NewsEvents/Pages/media.aspx? ......................... 11

United Nations Human Rights, Office of the High Commissioner for Human
Rights, *IACHR, UN Working Group on Arbitrary Detention, UN
Rapporteur on Torture, UN Rapporteur on Human Rights and Counter-
Terrorism, and UN Rapporteur on Health reiterate need to end the
indefinite detention of individuals at Guatánamo Naval Base in light of
current human rights crisis* (May 1, 2013),
www.ohchr.org/en/newsevents/pages/displaynews.aspx?newsid=13278 ........... 7

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| ADD | Addendum |
| APP | Appendix |
| AUMF | Authorization for the Use of Military Force |
| DE | Docket Entries in 05-0023 (D.D.C.) |
| DTA | Detainee Treatment Act |
| MCA | Military Commissions Act of 2006 |

## JURISDICTIONAL STATEMENT

The district court's *habeas corpus* jurisdiction is based on 28 U.S.C. § 2241. Jurisdiction of this Court to review the order denying petitioner's motion for a preliminary injunction is conferred by 28 U.S.C. § 1292(a)(1). The district court entered the order denying this motion on May 21, 2013. Mr. Abdullah filed his notice of appeal on July 8, 2013, therefore, his appeal is timely under Rule 4(a)(1)(B)(iii) of the Federal Rules of Appellate Procedure.

## STATEMENT OF ISSUES

1. Whether respondents' imprisonment of petitioner as "too dangerous to release" and his resulting permanent detention violates International Law made applicable here by the terms of the President's Recognition Agreement with Yemen?

2. Whether such detention also violates domestic law?

3. Whether the district court's refusal to enjoin such detention was erroneous?

4. Whether the district court's refusal to enjoin Respondents' other violations of International Law was erroneous?

## STATUTES AND REGULATIONS

The Authorization for the Use of Military Force ("AUMF"), upon

which the detention of petitioner is based, states in relevant part:

> [The President is authorized] to use all necessary and
> appropriate force against those nations, organizations, or
> persons he determines planned, authorized, committed, or
> aided the terrorist attacks that have occurred on
> September 11, 2001, or harbored such organizations or
> persons, in order to prevent any future acts of
> international terrorism against the United States by such
> nations, organizations, or persons.

AUMF, § 2(a), 115 Stat. 224, note following 50 U.S.C. § 1541.

## STATEMENT OF THE CASE

Responents have held petitioner at Guantanamo for over a decade.

And he will neither be released nor tried according to the respondents.  He is

indefinitely detained.  On January 7, 2005, he filed his *habeas* action below.  No

*habeas* hearing has been held.  Pursuant to the Executive Order directing the

closure of Guantanamo, an interagency Task Force was convened to evaluate and

classify prisoners at Guantanamo.[1]  "The purpose of the review was to collect and

examine information from across the government to determine which detainees the

United States should transfer or release from custody, prosecute, or otherwise

lawfully detain."  The Task Force specified four categories of prisoners.  One of

those categories governs petitioner (Report at ii):

---

[1] Available at: www.justice.gov/ag/guantanamo-review-final-report.pdf.

… detainees … determined to be too dangerous to
transfer but not feasible for prosecution.

The specified authority for this classification and assertion of power

was the AUMF, nothing else.  By his motion for a preliminary injunction filed

October 8, 2010, petitioner sought a ruling that his indefinite detention by reason

of his being "too dangerous to release," among other violations of International

Law,[2] was unlawful.  (APP000002, Dkt. No. 295.)  The gist of the motion was that

Abdullah's permanent, indefinite detention was illegal under international law,

including particularly the Law of War, as well as domestic law, and further, that

his International Law claims were insulated from Congressional tampering by the

terms of the Executive Agreement recognizing Yemen, which was an exercise of

the President's sole power to receive ambassadors.  The motion did *not* seek

Abdullah's immediate release, but rather an injunction, based on the requested

declaration, enforcing the Third Geneva Convention, *inter alia*, and prohibiting his

detention in violation of international law.  Such relief would not necessarily end

---

[2] Over the entire decade long course of its detention of Abdullah,
Respondents have declined to follow a number of provisions of International Law,
including those identified in Abdullah's moving papers below.  (APP000002, Dkt.
Nos. 296 at 34; 301 at 13.)

-3-

his detention but would only eliminate one ground for it.[3]  This motion was not

acted on for some 30 months.

No hearing on the *habeas* petition has been had and the court below

has noted that several pre-hearing motions must tbe resolved before any such

hearing.  (APP000002, Minute Order dated Sept. 30, 2010.)

## STATEMENT OF THE FACTS

Insofar as material to the issues in this appeal, the facts are simple.

Petitioner Abdullah is a citizen of Yemen, currently imprisoned in Guantanamo.

(APP000001, Dkt. No. 1.)  Respondents have declared him to be "too dangerous to

release" and thus he is permanently detained without reference to the authority, or

lack of it, for his capture and their exercise of mititary power against him.  He was

seized in Pakistan in September of 2002.  He has not been criminally charged in

any forum and apparently will not be so charged.  After his capture in 2002 in

Pakistan, he was sent to the Prison of Darkness in Afghanistan, thence ultimately

to Guantanamo, where he has remained.

On January 7, 2005, Abdullah filed a habeas petition challenging his

AUMF detention under international law, and other grounds.  (*Id.*)  The petition

has not yet been heard.  On October 8, 2010, he filed a motion for preliminary

---

[3] For examples of alternate bases for detention, see *Hamdan v. United States of America,* 696 F.3d 1238, 1241, fn. 1 (D.C. Cir. 2012).

injunction challenging his classification by the inter-agency Task Force as "too dangerous to release" and his resulting permanent detention. (APP000002, Dkt. No. 295.)

The court below took no action on this motion for thirty months. Then petitioner filed a mandamus petition on May 14, 2013, seeking to compel the district court's resolution of the motion (D.C. Circuit Case No. 13-5140). Pursuant to the rules of this court, a copy of the mandamus petition was served on the district court and shortly thereafter, on May 21, 2013, in a five page opinion, Roberts, J. denied the preliminary injunction motion. (APP000005, Dkt. No. 316.) The mandamus petition was subsequently dismissed as moot. This is an appeal of the order denying the injunction.

## SUMMARY OF THE ARGUMENT

When the President recognized the Kingdom of Yemen he conditioned such recognition on the parties' mutual observance of "the requirements and practices of generally recognized international law." It is those requirements that the motion below by a citizen of Yemen sought to enforce.

The content of that law includes two aspects: the Law of War and International Humanitarian law. Both are violated here and a court seized with a *habeas* petition of a Yemeni has a duty to apply such law. The Law of War includes the familiar Geneva Conventions. Domestic military detention

-5-

regulations mirror those Conventions and are independently effective. The indefinite imprisonment of petitioner, as well as other practices cannot be squared with either.

*Zivotofsky v. Sec'y of State*, 2013 U.S. App. LEXIS 14894 (D.C. Cir. July 23, 2013), recently decided by this court, confirms a long history of Supreme Court precedent and executive practice denying Congress the power to interfere with the President's recognition power.  Thus, legislation seeking to make the whole or any part of "the requirements and practices of generally recognized international law" unavailable to a Yemen citizen is unconstitutional and cannot prevent a *habeas* court from either declaring or applying those principles.

Here those requirements compel issuance of the injunction sought.

## ARGUMENT

### I.     Standard of Review

An order granting or denying a preliminary injunction which rests on questions of law is "essentially *de novo*."  *Al-Fayed v. Central Intelligence Agency,* 254 F. 3d 300, 304 (D.C. Cir 2001).

### II.    Under International Law, Indefinite or Permanent Detention is Prohibited

#### A.     The Content of International Law

The *Restatement* puts it this way: "A rule of international law is one that has been accepted as such by the international community of states ... by

international agreement...."[4]  Indisputably, the most familiar source of such law is

the multi-lateral international agreement open to any state signatory.  Two such

readily come to mind:  the Third Geneva Convention,[5] and the International

Covenant of Civil and Political Rights (ICCPR)[6].  The former is a part of the Law

of War and the latter a part of International Humanitarian Law.  The United States

is a party to each.  These bodies of law are not mutually exclusive.[7]  Rather, as the

International Court of Justice held in *Diallo*, their concurrent application is proper.[8]

      International agreements have been a part of United States law since

the beginning of the republic and, as is well known, one species is discussed in the

Constitution itself.  "The terminology used for international agreements is varied.

Among the terms used are: treaty, convention, agreement, protocol covenant,

---

[4] *Restatement (Third) of the Foreign Relations Law of the United States* at §102(1)(b).

[5] 6 U.S.T. 3316.

[6] 27 U.S.T. 1909.

[7] Press Release, United Nations Human Rights, Office of the High Commissioner for Human Rights, *IACHR, UN Working Group on Arbitrary Detention, UN Rapporteur on Torture, UN Rapporteur on Human Rights and Counter-Terrorism, and UN Rapporteur on Health reiterate need to end the indefinite detention of individuals at Guatánamo Naval Base in light of current human rights crisis* (May 1, 2013), available at: www.ohchr.org/en/newsevents/pages/displaynews.aspx?newsid=13278&langl. Para.29.

[8] *Ahmadou Sadiao Diallo (Republic of Guinea v. Democratic Republic of the Congo),* Merits Judgment, I.C.J. Reports 2010, Para. 13.

charter, statute, act, declaration, *concordat*, exchange of notes, agreed minute,

memorandum of agreement, memorandum of understanding, and *modus vivendi*."

*Restatement (Third) of the Foreign Relations Law of the United States*, §301,

comment *a*.  Most international agreements to which the United States is a party

are executive agreements or non-treaty agreements; that is, they are negotiated by

the President and entered into force without going through the process of advice

and consent of the Senate pursuant to Article II of the Constitution.

　　　　　International Law, particularly that part of it known as the Law of

War, has long been applicable in domestic judicial decisions.  In *Ex Parte Quirin*,

317 U.S. 1 (1942) at 27-28, the Supreme Court explained:

> From the very beginning of its history this Court has
> recognized and applied the law of war as including that
> part of the law of nations which prescribes, for the
> conduct of war, the status, rights and duties of enemy
> nations as well as of enemy individuals.[9]

This Law includes the Geneva Conventions.  *Hamdan v. Rumsfeld,* 548 U.S. 557

(2006).  Article V of the Third Geneva Convention entitles petitioner to the *full*

protections of its terms until and unless a prisoner is determined by a competent

tribunal to be subject only to the more general protections of Common Article 3.[10]

---------------------------

[9]And this court recently noted in *Hamdan v. United States*, 696 F.3d 1238
(D.C. Cir. 2012) that *Quirin* had so held.  *See* 696 F.3d at 1248-49.

[10]Article V provides:

　　　　The  present  Convention  shall  apply  to  the  persons

No such determination has been made and thus petitioner is entitled to the full protections of the Third Convention as a prisoner of war.

**B.     The Third Geneva Convention Prohibits Indefinite Detention**

The Third Geneva Convention, which is directly applicable here by reason of its incorporation by the Yemen Agreement discussed below, states as follows:

> Prisoners of war may not be sentenced by the military authorities and courts of the Detaining Power to any penalties except those provided for in respect of members of the armed forces of the said Power who have committed the same acts.
>
> ****
>
> Collective punishment for individual acts, corporal punishments, imprisonment in premises without daylight and, in general, any form of torture or cruelty, are forbidden. *Prisoners of war may not be sentenced by the military authorities and courts of the Detaining Power to any penalties except those provided for in respect of members of the armed forces of the said Power who have committed the same acts.*
> (§87)

---

> referred to in Article 4 from the time they fall into the power of the enemy and until their final release and repatriation. Should any doubt arise as to whether persons, having committed a belligerent act and having fallen into the hands of the enemy, belong to any of the categories enumerated in Article 4, such persons shall enjoy the protection of the present Convention until such time as their status has been determined by a competent tribunal."

It is quite apparent that indefinite detention without trial cannot be squared with this simple provision. Article 87 embodies a military version of the Golden Rule: "Do unto others as you would have them do unto you." This notion of reciprocity means that if a punishment is not available under the Uniform Code of Military Justice ("UCMJ") against the U.S. military, neither is it available to the detaining power (the United States) against prisoners such as Abdullah. There is no provision in the UCMJ permitting such detention or treatment and therefore it cannot be imposed by the jailers here. And the protections of this Article may not be eliminated by any sentence (§ 108). Thus, the present indefinite detention of petitioner is contrary to the terms of the Third Convention.

**C.  Declarations of International Authorities Confirm the Illegality of Such Detention Both Under International Humanitarian Law and the Law of War.**

Responsible international authorities have confirmed that indefinite detention violates both the Law of War and International Humanitarian Law. On April 5, 2013, the United Nations High Commissioner for Human Rights concluded in a public statement that the designation of prisoners at Guantanamo for indefinite detention puts the "United States ... in clear breach not just of its own commitments but also of international laws and standards that it is obliged to

uphold.  When other countries breach these standards, the US – quite rightly – strongly criticizes them for it."[11]

Likewise, the Office of the United Nations High Commissioner, Working Group on Arbitrary Detention, concluded on May 3, 2013 that the detention of a prisoner, Obaidullah, whose circumstances of indefinite detention are indistinguishable from petitioner's, constituted a "form of cruel, inhuman and degrading treatment." ¶ 24.  These are, of course, the same concepts and practices directly banned by Common Article 3 of the Third Convention.  And respondents do not contest the applicability of Common Article 3 to their conduct.

But the findings and conclusions of the Working Group are much more broadly based than the Law of War: the Commissioner also determined that indefinite detention violates International Humanitarian Law in addition to the Law of War.  These violations are relevant in light of the continuing vitality of that law in this proceeding. The Report notes that arbitrary detention is banned both by the Universal Declaration of Human Rights, and by sections 9 and 14 of the ICCPR. (ADD000001-2.)  As noted above, International Humanitarian Law, as set out in the ICCPR, is "[a] rule of international law ... that has been accepted as such by the international community of states ... by international agreement...."

---

[11] Available at:  http://www.ohchr.org/EN/NewsEvents/Pages/media.aspx?IsMediaPage=true.

*Restatement* at §102(1)(b).  And the International Court of Justice specifically held in the *Diallo* case that the ICCPR applies to *any* form of detention "whatever its basis and legal objective being pursued."  Ahmadou Sadiao Diallo *(Republic of Guinea v, Democratic Republic of the Congo),* Merits Judgment, I.C.J. Reports 2010, Para. 77.  As the United States has not derogated from any provision of the ICCPR, it applies here.  And as the Working Group concluded, indefinite detention violates article 9 and 14 wholly apart from the Law of War.  This conclusion is persuasive here whether or not the ICCPR be regarded as "self-executing" or not.[12] Its incorporation by the Yemen Agreement makes it applicable in this *habeas* proceeding establishing a detention contrary to a treaty or law of the United States. 28 U.S.C. § 2241.

## III.    The Executive Recognition Agreement of Yemen Prevents Congressional Nullification of International Law Rights of Yemeni Citizens

The President's recognition of Yemen was conditioned on entry into an executive agreement with the Kingdom of Yemen on May 4, 1946 (the "Agreement"). The Agreement became effective upon Yemen's adherence to it, namely May 4, 1946 and was registered with the United Nations May 20, 1947. Article III of the Agreement provides:

---

[12] See *McKesson Corp. v. Islamic Republic of Iran*, 539 F.3d 485, 488 (D.C. Cir. 2008), 383 U.S. App. D.C. 168, 2008 U.S. App. LEXIS 18163.

Subjects of His Majesty the King of the Yemen in the United States of America and nationals of the United States of America in the Kingdom of the Yemen *shall be received and treated in accordance with the requirements and practices of generally recognized international law.* In respect of their persons, possessions and rights, such subjects or nationals shall enjoy the fullest protection of the laws and authorities of the country, and shall not be treated in any manner less favorable than the nationals of any third country. Subjects of His Majesty in the United States of America and nationals of the United States of America in the Kingdom of the Yemen shall be subject to the local laws and regulations, and shall enjoy the rights and privileges accorded in this third Article. (*Emphasis added.*)

The Agreement remains in effect, and applies throughout the current Republic of Yemen and the United States, including Guantanamo Bay. (See §6 of the Agreement.) The Agreement was part and parcel of recognition by the United States of Yemen as was specifically noted in the letter enclosing the Agreement's language from William Eddy, Chief Special U.S. Diplomatic Mission of the Kingdom of the Yemen, to the Deputy Minister of Foreign Affairs of the Kingdom of Yemen. (ADD000003.)

**A.  This Court's Decision in *Zivotofsky* Insulates the Exercise of the President's Exclusive Recognition Power from Congressional Nullification**

This court's decision in *Zivotofsky v. Secretary of State*, 2013 U.S. App. LEXIS 14894 (dec. July 23, 2013) applies a long line of Supreme Court precedent and executive practice to conclude that the President's power to

-13-

recognize foreign sovereigns and the terms on which such recognition is extended

is an exclusive presidential power.  This power, like the power of pardon, belongs

to the President alone.  *See United States v. Klein*, 80 U.S. 121 (1871).

Accordingly, this court struck down a duly enacted statute[13] but one which was

contrary to the terms on which the president had recognized a foreign state.  The

same result follows here insofar as provisions of the MCA (a) forbid application of

the Geneva Conventions or International Law by this court or (b) would modify or

eliminate existing power and duty of this court to apply such law.  It follows that

the above analysis establishing the illegality of indefinite detention must be applied

here.

## IV.   Indefinite or Permanent Detention is Likewise Prohibited by Domestic Law

This court recently had occasion to apply "Article 24 of the First

Geneva Convention and Section 3-15(b)(1)-(2) of Army Regulation 190-8" in

deciding the *habeas* case of  Al Warafi.  (*Al Warifi v. Obama,* 716 F.3d 627 (D.C.

Cir. 2013).  The court held:

> In Section 5 of the Military Commissions Act of 2006,
> Congress provided, among other things, that a detainee
> may not invoke the Geneva Conventions in a habeas
> proceeding. However, Army Regulation 190-8 expressly
> incorporates relevant aspects of the Geneva Convention's

---

[13] Foreign Relations Authorization Act, Fiscal Year 2003, Public Law 107-228 (Sept. 30, 2002), 116 Stat. 1350.

medical personnel protection. Army Regulation 190-8 is domestic U.S. law, and in a habeas proceeding such as this, a detainee may invoke Army Regulation 190-8 to the extent that the regulation explicitly establishes a detainee's entitlement to release from custody. Therefore, for purposes of determining whether Al Warafi is entitled to release as medical personnel under Army Regulation 190-8, *we may and must analyze the relevant aspects of the Geneva Conventions that have been expressly incorporated into Army Regulation* 190-8. (*Slip Op. 4, emphasis supplied*.)

The same Army Regulation also provides "All persons taken into custody by U.S. forces will be provided with the protections of the GPW until some other legal status is determined by competent authority" §1-5-1(a)(2). The reference "GPW" is to "[t]he 1949 Geneva Convention Relative to the Treatment of Prisoners of War (GPW)." Thus the analysis set out in Section II above applies as a matter of *domestic* law independently of the Yemen Agreement and the exclusive presidential power to condition recognition of a foreign state on mutual observance of International Law. Likewise, the *Warafi* analysis of §190-8 was based on this court's review of commentary and other interpretive tools normally applied in construing the Conventions themselves. This is the same approach to construction applied by the Supreme Court in *Hamdan v. Rumsfeld*, *supra*, as well. Thus, the meaning ascribed to the Conventions and the ICCPR by the Working Group and recounted above are highly persuasive.

-15-

In short, indefinite detention cannot be squared either with the Law of War or International Humanitarian Law.

## V. The District Court's Failure to Enjoin Other Violations of International Law was Erroneous

In addition to its unlawful indefinite detention of Abdullah, Respondents have violated a number of other applicable provisions of International Law. While they claim, erroneously, that their operation of the prison complies with Common Article 3 of the Geneva Conventions, Respondents do not even pretend that their detention of Abdullah complies with *all* the provisions of the Third Geneva Convention. For example, Respondents are now, and have been for a decade, violating sections 3, 25, 70-72, and 78-79, among others. As noted above, however, they have been and continue to be required to accord Abdullah full rights under the Third Geneva Conventions until he is properly adjudicated a person not entitled to those protections by a properly constituted tribunal. Instead, Respondents claim that they can detain Abdullah as a member of an "enemy force" forever without according any of the rights and privileges that apply to enemy soldiers. as a matter of the Law of War, and apply to citizens of Yemen as a matter of the Yemen Agreement.

## VI. Refusal to Issue The Injunction Against Such Detention Was Error

The correct framework for considering the denial of the injunction below is found in *Hamdan v. Rumsfeld*, *supra*. The Supreme Court reviewed the

-16-

grant, and this court's denial on review, of Hamdan's request for a preliminary injunction restraining his criminal prosecution on grounds it violated Common Arcticle 3 of the Third Geneva Convention, one of the authorities here invoked. The Court satified itself that the prosecution violated the Convention and then enjoined it. The Court did not ask if the violation of Common Article 3 threatened the prisoner with irreparable injury, nor whether the injunction it issued was in the public interest. Thus, the Court did not apply or discuss the familiar fourfold test for the grant of a preliminary injunction. A violation of the Law of War, once established, was enough to warrant the injunction. Likewise here.

Accordingly, the court below erred in treating petitioner's request that plainly illegal detention be enjoined. Apparently, the court believed that petitioner sought an order of *release* from confinement. (APP000010.) This was a clear blunder, as all petitioner sought was an injunction against his perpetual detention and enforcement of the Third Geneva Convention, not a release, which is the ultimate *habeas* remedy. Petitioner sought no short circuit of the *habeas* proceeding.

A Detaining Power unwilling or unable to discharge its responsibilities under the Law of War, more particularly the Third Geneva Convention, has two, and only two, options: it may (1) transfer its prisoners to another Party where they can be held appropriately, or (2) it can send them home.

-17-

Levie, *Prisoners of War in International Conflicts*, 59 Int'l Law Stud. at 127-29

(Naval War College 1979) Third Geneva Convention §10..  Procedurally, we are at

the antecedent step: respondents are claiming that Abdullah has no right to insist

on compliance with international law.  The district court had (and now this Court

has) an opportunity to correct respondents' misunderstanding concerning their

accountability under the law, and consequently to put the choice to respondents:

comply or face in a subsequent proceeding the remedial consequences of failure to

comply.  The exercise of such judicial power is most assuredly not, as the court

below apparently believed, a request for immediate release, the ultimate *habeas*

remedy.

      In addition, this court's *Zivotofsky* opinion had not been issued when

the court ruled in hasty response to the mandamus proceeding filed by petitioner.

However, the analysis of the *Zivotofsky* opinion exactly tracks the argument

presented to the district court in petitioner's motion, but which the court refused to

apply.  It follows that the injunction should be issued forthwith.

      This is not to say that the familiar considerations apart from

probability of success on the merits – irreparable injury, absence of harm to other

parties, and the public interest – are irrelevant.  But where a a prisoner is held in

violation of International Law, be it the Law of War or Humanitarian Law, these

other tests are satisfied.  That is the teaching of the Supreme Court in *Hamdan* and

it is binding here.

## CONCLUSION

The order denying the preliminary injunction should be reversed and

the injunction prayed for issued.

Respectfully submitted,

Stephen M. Truitt
600 Fourteenth Street NW
Hamilton Square, Suite 500
Washington, DC 20005
202.220.1452
truittsm@gmail.com

Charles H. Carpenter
CARPENTER LAW FIRM plc
210 North Higgins Avenue, Suite 336
Missoula, Montana  59802
406.543.0511
carpentc@carpenterlawfirmplc.com

Dated:  August 30, 2013                *Attorneys for Petitioner-Appellant*

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 13-5203

HANI RASCHID ABDULLAH,

*Petitioner-Appellant*

v.

BARACK OBAMA, *et al.*,

*Respondents-Appellees.*

On Appeal from the United States District Court for the
District of Columbia, No. 05-cv-0023, Hon. Richard Roberts, *Judge*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 4,074 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using MSWord 2007 in

14 point Times New Roman.

Stephen M. Truitt
*Attorney for Petitioner-Appellant*

Dated:  August 30, 2013

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 30th day of August, 2013, copies of the

foregoing Opening Brief for Appellant were electronically filed and emailed to:

      Dana Kaersving
      Sharon Swingle
      Appellate Staff Civil Division
      Department of Justice
      950 Pennsylvania Avenue, N.W., Room 7268
      Washington, D.C.  20530-0001

                                  _____
                              Stephen M. Truitt

#20431737 v15

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 13-5203

HANI RASCHID ABDULLAH,

*Petitioner-Appellant*

v.

BARACK OBAMA, *et al.*,

*Respondents-Appellees.*

On Appeal from the United States District Court for the
District of Columbia, No. 05-cv-0023, Hon. Richard Roberts, *Judge*

## ADDENDUM TO
## OPENING BRIEF FOR PETITIONER-APPELLANT

Stephen M. Truitt
600 Fourteenth Street NW
Hamilton Square, Suite 500
Washington, DC 20005
(202) 220-1452

Charles H. Carpenter
CARPENTER LAW FIRM plc
210 North Higgins Avenue, Ste. 336
Missoula, Montana 59802
(406)543-0511

*Attorneys for Petitioner-Appellant*                    Dated: August 30, 2013

## TABLE OF CONTENTS

1.     International Covenant on Civil and Political Rights
       (March 23, 1976) - Excerpts.......................................................ADD000001

2.     United States of America and Yemen - Exchange of Notes
       constituting an agreement relating to friendship and commerce
       (4 May 1946) ................................................................................ADD000003

**International Covenant on Civil and Political Rights,**
G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52,
U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171,
*entered into force* Mar. 23, 1976

**EXCERPTS:**

*Article 9.*

1.   Everyone has the right to liberty and security of person.  No one shall be subjected to arbitrary arrest or detention. No one shall be deprived of his liberty except on such grounds and in accordance with such procedure as are established by law.

2.   Anyone who is arrested shall be informed, at the time of arrest, of the reasons for his arrest and shall be promptly informed of any charges against him.

3.   Anyone arrested or detained on a criminal charge shall be brought promptly before a judge or other officer authorized by law to exercise judicial power and shall be entitled to trial within a reasonable time or to release. It shall not be the general rule that persons awaiting trial shall be detained in custody, but release may be subject to guarantees to appear for trial, at any other stage of the judicial proceedings, and, should occasion arise, for execution of the judgment.

4.   Anyone who is deprived of his liberty by arrest or detention shall be entitled to take proceedings before a court, in order that that court may decide without delay on the lawfulness of his detention and order his release if the detention is not lawful.

5.   Anyone who has been the victim of unlawful arrest or detention shall have an enforceable right to compensation.

*Article 14.*

1.   All persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law. The Press and the public may be excluded from all or part of a trial for reasons of morals, public order *(ordre public)* or national security in a democratic society, or when the interest of the private lives of the parties so requires, or to the extent strictly necessary in the opinion of the court in special circumstances where publicity would prejudice the interests of justice; but any judgment rendered in a criminal case or in a suit at law shall be made public except where the interest of juvenile persons otherwise requires or the proceedings concern matrimonial disputes or the guardianship of children.

2.  Everyone charged with a criminal offence shall have the right to be presumed innocent until proved guilty according to law.

3.  In the determination of any criminal charge against him, everyone shall be entitled to the following minimum guarantees, in full equality:

(a)  To be informed promptly and in detail in a language which he understands of the nature and cause of the charge against him;

(b)  To have adequate time and facilities for the preparation of his defence and to communicate with counsel of his own choosing;

(c)  To be tried without undue delay;

(d)  To be tried in his presence, and to defend himself in person or through legal assistance of his own choosing; to be informed, if he does not have legal assistance, of this right; and to have legal assistance assigned to him, in any case where the interests of justice so require, and without payment by him in any such case if he does not have sufficient means to pay for it;

(e)  To examine, or have examined, the witnesses against him and to obtain the attendance and examination of witnesses on his behalf under the same conditions

as witnesses against him;

(f)  To have the free assistance of an interpreter if he cannot understand or speak the language used in court;

(g)  Not to be compelled to testify against himself or to confess guilt.

4.  In the case of juvenile persons, the procedure shall be such as will take account of their age and the desirability of promoting their rehabilitation.

5.  Everyone convicted of a crime shall have the right to his conviction and sentence being reviewed by a higher tribunal according to law.

6.  When a person has by a final decision been convicted of a criminal offence and when subsequently his conviction has been reversed or he has been pardoned on the ground that a new or newly discovered fact shows conclusively that there has been a miscarriage of justice, the person who has suffered punishment as a result of such conviction shall be compensated according to law, unless it is proved that the non-disclosure of the unknown fact in time is wholly or partly attributable to him.

7.  No one shall be liable to be tried or punished again for an offence for which he has already been finally convicted or acquitted in accordance with the law and penal procedure of each country.

## No. 43

---

## UNITED STATES OF AMERICA
## and
## YEMEN

### Exchange of Notes constituting an agreement relating to friendship and commerce. Sana'a, 4 May 1946

Came into force on 4 May 1946 by signature.

*English and Arabic official texts communicated by the United States representative to the United Nations. The registration took place on 20 May 1947.*

---

## ETATS-UNIS D'AMERIQUE
## et
## YEMEN

### Echange de notes constituant un accord d'amitié et de commerce. Sana, le 4 mai 1946

Entré en vigueur le 4 mai 1946 par signature.

*Textes officiels anglais et arabe communiqués par le représentant des Etats-Unis auprès de l'Organisation des Nations Unies. L'enregistrement a eu lieu le 20 mai 1947.*

USCA Case #13-5203     Document #1454584         Filed: 08/30/2013     Page 34 of 38

## No. 43.  EXCHANGE OF NOTES BETWEEN THE UNITED STATES OF AMERICA AND THE KINGDOM OF THE YEMEN CONSTITUTING AN AGREEMENT RELATING TO FRIENDSHIP AND COMMERCE. SANA'A, 4 MAY 1946

I

*The Chief, Special United States Diplomatic Mission of the Kingdom of the Yemen, to the Yemen Deputy Minister of Foreign Affairs*

SPECIAL U. S. DIPLOMATIC MISSION
TO THE KINGDOM OF THE YEMEN

Sana'a, May 4, 1946

EXCELLENCY:

I have the honor to make the following statement of my Government's understanding of the agreement reached through conversations held at Sana'a April 14 to May 4 by representatives of the Government of the United States of America and the Government of the Kingdom of the Yemen with reference to diplomatic and consular representation, juridical protection, commerce and navigation as hereafter defined. These two Governments, having in mind the letter dated March 4, 1946,[1] from the President of the United States of America to the Imam Yehya Bin Mohamed Hamid-ud-din, King of the Yemen, by which the United States of America recognized the complete and absolute independence of the Kingdom of the Yemen, and desiring to strengthen the friendly relations happily existing between the two countries, and to respect the rights of this independence recognized by the above-mentioned letter as the basis for all their relations and to maintain the most-favored-nation principle in its unconditional and unlimited form as the basis of their commercial relations, agree to the following provisions:

ARTICLE I

The United States of America and the Kingdom of the Yemen will exchange diplomatic representatives and consular officers at a date which shall be fixed by mutual agreement between the two Governments.

---

[1] Not printed.

USCA Case #13-5203     Document #1454584         Filed: 08/30/2013     Page 35 of 38

### ARTICLE II

The diplomatic representatives of each Party accredited to the Government of the other Party shall enjoy in the territories of such other Party the rights, privileges, exemptions and immunities accorded under generally recognized principles of international law. The consular officers of each Party who are assigned to the Government of the other Party, and are duly provided with exequaturs, shall be permitted to reside in the territories of such other Party at the places where consular officers are permitted by the applicable laws to reside; they shall enjoy the honorary privileges and the immunities accorded to officers of their rank by general international usage; and they shall not, in any event, be treated in a manner less favorable than similar officers of any third country.

### ARTICLE III

Subjects of His Majesty the King of the Yemen in the United States of America and nationals of the United States of America in the Kingdom of the Yemen shall be received and treated in accordance with the requirements and practices of generally recognized international law. In respect of their persons, possessions and rights, such subjects or nationals shall enjoy the fullest protection of the laws and authorities of the country, and shall not be treated in any manner less favorable than the nationals of any third country. Subjects of His Majesty in the United States of America and nationals of the United States of America in the Kingdom of the Yemen shall be subject to the local laws and regulations, and shall enjoy the rights and privileges accorded in this third Article.

### ARTICLE IV

In all matters relating to customs duties and charges of any kind imposed on or in connection with importation or exportation or otherwise affecting commerce and navigation, to the method of levying such duties and charges, to all rules and formalities in connection with importation or exportation, and to transit, warehousing and other facilities, each Party shall accord unconditional and unrestricted most-favored-nation treatment to articles the growth, produce or manufacture of the other Party, from whatever place arriving, or to articles destined for exportation to the territories of such other Party, by whatever route. Any advantage, favor, privilege or immunity with respect to any duty, charge or regulation affecting commerce or navigation now or hereafter accorded by the United States of America or by the Kingdom of the Yemen to any third country will be accorded immediately and unconditionally to the commerce and navigation of the Kingdom of the Yemen and of the United States of America, respectively. The advantages relating to customs duties now or hereafter accorded by the United

No. 43

USCA Case #13-5203      Document #1454584           Filed: 08/30/2013      Page 36 of 38

States of America to the Republic of Cuba shall be excepted from the provisions of this Agreement.

### ARTICLE V

There shall be excepted from the provisions of Article IV of this Agreement advantages now or hereafter accorded: by virtue of a customs union of which either Party may become a member; to adjacent countries in order to facilitate frontier traffic; and by the United States of America or its territories or possessions to one another or to the Panama Canal Zone.

The last clause shall continue to apply in respect of any advantages now or hereafter accorded by the United States of America or its territories or possessions to one another irrespective of any change in the political status of any such territories or possessions. Nothing in this Agreement shall prevent the adoption or enforcement by either Party within the area of its jurisdiction: of measures relating to the importation or exportation of gold or silver or the traffic in arms, ammunition, and implements of war, and, in exceptional cicumstances, all other military supplies; of measures necessary in pursuance of obligations for the maintenance of international peace and security or necessary for the protection of the essential interests of such Party in time of national emergency; or of statues in relation to immigration and travel. Subject to the requirement that, under like circumstances and conditions, there shall be no arbitrary discrimination by either Party against the subjects, nationals, commerce or navigation of any third country, the provisions of this Agreement shall not extend to prohibitions or restrictions: imposed on moral or humanitarian grounds; designed to protect human, animal, or plant life or health; relating to prison-made goods; or relating to the enforcement of police or revenue law.

### ARTICLE VI

The provisions of this Agreement shall apply to all territory under the sovereignty or authority of either of the parties, except the Panama Canal Zone.

### ARTICLE VII

This Agreement shall continue in force until superseded by a more comprehensive commercial agreement, or until thirty days from the date of a written

No. 43

ADD000006

| 172 | *United Nations — Treaty Series* | 1947 |
|---|---|---|

notice of termination given by either party to the other Party, whichever is the earlier. Moreover, either Party may terminate Articles I, II, III, or IV on thirty days written notice.

If the above provisions are acceptable to the Government of the Kingdom of the Yemen this note and the reply signifying assent thereto shall, if agreeable to that Government, be regarded as constituting an agreement between the two Governments which shall become effective on the date of such acceptance.

Accept, Excellency, the assurances of my highest consideration.

William A. Eddy
*Chief, Special U. S. Diplomatic Mission
of the Kingdom of the Yemen*

Al Qadi Abdul Karim Mutahhar
*Deputy Minister of Foreign Affairs
Kingdom of the Yemen*

No. 43

USCA Case #13-5203      Document #1454584          Filed: 08/30/2013      Page 38 of 38

## II

TRANSLATION[1] — TRADUCTION[1]

THE ISLAMIC GOVERNMENT
ORDAINED BY ALLAH

Sana'a
May 4, 1946
Jamada-al-Thaniya, 3, 1365

His Excellency
Mr. William Alfred Eddy
*Chief, U. S. Special Mission*
*to the Kingdom of The Yemen*

I have the honor to acknowledge receipt of Your Excellency's letter dated May 4, 1946, corresponding to Jamada-al-Thaniya, 3, 1365, the text of which is as follows: —

*(Here follows the text of Note No. I.)*

On behalf of the Government of the Yemen, I declare my government's adherence to the provisions stated in this Agreement which is considered effective on the date of signature.

Abdul KARIM MUTAHHAR
*Deputy Foreign Minister*

---

## II

TRADUCTION — TRANSLATION

LE GOUVERNEMENT ISLAMIQUE
DÉCRÉTÉ PAR ALLAH

Sana
le 4 mai 1946
3  Jamada-al-Thaniya, 1365 A. H.

A Son Excellence,
M. William Alfred Eddy
*Chef de la Mission diplomatique spéciale des Etats-Unis*
*dans le Royaume du Yémen*

J'ai l'honneur d'accuser réception de la lettre de Votre Excellence en date du 4 mai 1946, correspondant au 3 Jamada-al-Thaniya, 1365 A.H., dont le texte est ainsi conçu:

*(Suit le texte de la Note No I.)*

Au nom du Gouvernement du Yémen, je déclare que mon Gouvernement approuve les dispositions contenues dans le présent accord qui est considéré comme entrant en vigueur à la date de sa signature.

*Le Ministre adjoint des Affaires étrangères*
Abdul KARIM MUTAHHAR

---

[1] Translation by the Department of State of the United States of America

[1] Traduction du Département d'Etat des Etats-Unis d'Amérique.

N° 43